UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| TYLER ANDREW BONETTI, an individual and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TRISTRUX LLC, et al.,<br><br>Defendants. | Case No. 24-cv-01319-LB<br><br>**ORDER COMPELLING ARBITRATION**<br><br>Re: ECF No. 7 |

## INTRODUCTION

In this putative wage-and-hours class action filed in state court and removed to federal court, the plaintiff sued his former employer TriStruX LLC, his supervisor James Cortez, and John Kelly, the head of West Coast operations, asserting state-law wage-and-hours claims, including a failure to pay minimum and overtime wages and provide meal and rest breaks. The defendants asserted diversity jurisdiction under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), and moved to compel arbitration.[1] The plaintiff moved to remand on the ground that TriStruX did not establish that the amount in controversy exceeds $5 million, as required by CAFA.[2] The court denies the

---

[1] Notice of Removal – ECF No. 1; Mot. – ECF No. 8. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Mot. to Remand – ECF No. 17.

ORDER – No. 24-cv-01319-LB

motion to remand and compels arbitration without prejudice to the plaintiff's asserting a PAGA representative claim. The UCL claim is dismissed without prejudice to asserting it in state court. The court stays the case until the arbitration is complete.

## STATEMENT

The plaintiff, a resident of California, worked for TriStruX as a non-exempt employee from "approximately" October 2023 through November 2023.[3] The individual defendants are citizens of California, and TriStruX is a limited-liability company that, based on its structure, is a citizen of Delaware, New Jersey, Pennsylvania, New York, Illinois, and North Carolina.[4]

The plaintiff alleges generally that "[f]or at least four (4) years prior to the filing of this action and continuing to the present, Defendants have, at times, failed to pay overtime wages to Plaintiff and Class Members. . . ." This includes failing to properly pay class members for working over eight hours per day, over forty hours per week, and "[for] hours worked on the seventh consecutive work day in a work week. . . ." For example, class members allegedly have had to "come early to work and leave late [from] work without being able to clock in for all that time." They waited in lines, donned and doffed uniforms and safety equipment, and did other tasks. There are other allegations, such as that the defendants failed to provide meal and rest periods.[5]

The complaint asserts nine claims for violations of state wage-and-hour laws and California's Unfair Competition Law (UCL).[6] The defendants' notice of removal asserts diversity jurisdiction under CAFA and — supported by declarations from Cathy Potter, TriStruX's Vice President of Human Capital — calculates potential damages of $6,506,379.25 to $8,423,069.00.[7]

---

[3] Compl. – ECF No. 1-1 at 9 (¶ 2).

[4] Notice of Removal – ECF No. 1 at 4–5 (¶¶ 19–25) (summarizing citizenship of its sole member TriStruX Holdings LLC and the citizenship of its members).

[5] Compl. – ECF No. 1-1 at 18–28 (¶¶ 35–98).

[6] Id.

[7] Notice of Removal – ECF No. 1 at 14–15 (¶ 76); Potter Decl. – ECF No. 1-2; Potter Supp. Decl. – ECF No. 20-1.

To perform her calculations concerning the wages, wage rates, active work periods, leave periods, numbers of current and former employees, and number of wage-statement periods relevant to current and former hourly records in California, Ms. Potter reviewed the following:

> (a) a report from Defendants' payroll provider reflecting all recorded work hours during calendar years 2021, 2022, and 2023, including, for each employee, daily clock-in and clock-out times, non-overtime work hours recorded between clocking in and clocking out, overtime hours recorded between clocking in and clocking out, and recorded paid time off hours,
>
> (b) a census of former employees whose employment terminated between January 26, 2021, and January 26, 2024, including their base hourly wage rates, dates of hire, and dates of termination,
>
> (c) a census of all employees who were entered into Defendants' payroll system between January 26, 2020, and January 26, 2024, including dates of hire, dates of termination, wage rates, and the effective date of any changes in wage rate, and
>
> (d) a census of all employee leaves of absence due to family and medical leave or workers' compensation leave, including as to each employee the duration of the leave periods.[8]

For the overtime claim, TriStruX identified (1) 276 qualifying employees from January 26, 2020, to the present, who were paid wages, (2) 244 qualifying employees from January 26, 2021, to January 26, 2024, who worked 12,849 workweeks, (3) 53 qualifying employees from January 26, 2020, to January 26, 2021, who worked 1,071 workweeks, and (4) 143 qualifying employees from January 26, 2023, to January 26, 2024, who worked 5,097 workweeks.[9] For the three-year period from January 26, 2021, to January 26, 2024, TriStruX took the actual wage rate in effect for each employee, multiplied that number by 1.5, multiplied the resulting number by 2, and then multiplied that number by the number of the workweeks at the wage rate, resulting in potential damages of $1,128,356.99 (assuming two overtime hours) and $564,178.50 (assuming one hour). Using averages instead of individual wages results in a base hourly wage of $27.55, a potential overtime rate of $41.32, which is $1,061,841.36 (for two overtime hours) or $530,920.68 (for one

---

[8] Potter Decl. – ECF No. 1-2 at 3–4 (¶ 11).

[9] Notice of Removal – ECF No. 1 at 7 (¶¶ 35–38) (citing Potter Decl. – ECF No. 1-2 at 4 (¶¶ 12–15)).

hour).[10] For the one-year period from January 26, 2020, to January 26, 2021, using the actual wage rates yields $84,863.34 (for two overtime hours) or $42,431.67 (for one hour).[11]

For the minimum-wage claim, TriStruX took the lowest minimum wage in effect from January 26, 2020, to January 26, 2024 ($13), assumed one hour of unpaid minimum wages per workweek for the three years between January 26, 2021, and January 26, 2024, and calculated $167,037 in potential damages ($13 times 12,849 workweeks). Applying the same calculation to January 26, 2020, through January 26, 2021, is $13,923 ($13 times 1,071 workweeks).[12]

For the meal-periods claim, TriStruX took the hourly rate for each qualifying employee during January 26, 2021, to January 26, 2024, considered the plaintiff's claim for one hour of pay for each workday with a non-compliant meal break (under Cal. Lab. Code § 226.7 and the applicable ICW wage order), determined the number of workweeks each employee worked, and calculated potential damages of $752,294 (for two hours) and $376,147 (for one hour). Using the average base wage of $27.55 (based on the initial wage rate and excluding any wage increases) multiplied by 12,849 workweeks is $707,979.90 (two hours owed) and $353,989.94 (one hour).[13]

For the rest-periods claim, TriStruX followed the same methodology. Using actual wage rates, this is $752,294 (for two hours owed) and $376,147 (for one hour). Using the average wage rate of $27.55 results in $707,979.90 (two hours owed) and $353,989.95 (one hour).[14]

For the termination-wages claim, from January 26, 2021, to January 26, 2024, there were terminations of 155 qualifying employees, all terminated thirty days or more before January 26, 2024.[15] During calendar year 2023, qualifying employees recorded an average of 7.65 hours of non-overtime work per day, which excludes any periods of time recorded as paid or unpaid leave.[16]

---

[10] *Id.* at 7–8 (¶¶ 39–40) (citing Potter Decl. – ECF No. 1-2 at 7 (¶¶ 33–34)).

[11] *Id.* at 8 (¶ 41) (citing Potter Decl. – ECF No. 1-2 at 7 (¶ 35)).

[12] *Id.* at 8–9 (¶¶ 45–46) (citing Potter Decl. – ECF No. 1-2 at 6–7 (¶¶ 29–30)).

[13] *Id.* at 9 (¶¶ 48–52) (citing Potter Decl. – ECF No. 1-2 at 5–6 (¶¶ 24–27)).

[14] *Id.* at 10 (¶¶ 54–55) (citing Potter Decl. – ECF No. 1-2 at 6 (¶ 28()).

[15] *Id.* at 10 (¶ 58) (citing Potter Decl. – ECF No. 1-2 at 5 (¶ 19)).

[16] *Id.* (¶ 59) (citing Potter Decl. – ECF No. 1-2 at 5 (¶ 20)).

During calendar years 2022 and 2023, qualifying employees recorded an average of 7.62 hours of non-overtime work, which excludes overtime hours recorded and time recorded as unpaid or paid leave. Based on this average, TriStruX expects that each employee on average would take two rest periods and one meal break.[17] TriStruX calculated the potential waiting-time penalties by taking each employee's wage rate at termination, multiplying it by eight hours to calculate a daily rate of pay, and multiplying that rate by thirty days. That results in $1,128,356.99. Using the average hourly rate at termination of $28.22 results in $1,049,784.[18] This calculation is predicted on the plaintiff's allegation that all class members sustained lost wages that trigger waiting-time penalties.[19]

For the wage-statements claim, there were 5,097 workweeks from January 26, 2023, to January 26, 2024, and 143 qualifying employees. Assigning a value of $50 for the first wage statement for each employee and $100 for each subsequent wage statement (*see* Cal. Lab. Code § 226(e)) results in a maximum of $4,000 for each employee and a total of $425,550.[20]

For the late-payment-of-wages claim, to calculate the penalties from the claimed non-payment of minimum wage under Cal. Lab. Code § 1197.1 for January 26, 2023, to January 26, 2024, TriStruX applied an initial penalty rate of $100 for the first workweek for each of the 143 qualifying employees (totaling $14,300) and $250 for each workweek for the rest of the period (totaling $1,238,500 ($250 times 4,954 work weeks)).[21] For the value of the Labor Code § 210 penalties, TriStruX applied an initial penalty rate of $100 to each qualifying employee who worked from January 26, 2023, to January 26, 2024, which totals $14,300. It applied $200 for each remaining workweek, totaling $990,800 ($200 times 4,954 workweeks). To calculate the twenty-five percent of the amount withheld, TriStruX assumed one hour of minimum wage work per week and one hour of overtime pay per week, times 4,954 workweeks, times .25, which equals

---

[17] *Id.* at 11 (¶ 60) (citing Potter Decl. – ECF No. 1-2 at 5 (¶ 21)).

[18] *Id.* (¶¶ 61–62) (citing Potter Decl. – ECF No. 1-2 at 5 (¶¶ 22–23)).

[19] *Id.* (¶ 63) (citing *Ford v. CEC Entm't, Inc.*, No. CV 14-01420 RS, 2014 WL 33779490 (N.D. Cal. July 10, 2014)).

[20] *Id.* at 12 (¶¶ 65–67) (citing Potter Decl. – ECF No. 1-2 at 4–5 (¶¶ 17–18)).

[21] *Id.* at 12–13 (¶ 70) (citing Potter Decl. – ECF No. 1-2 at 7 (¶ 31)).

$69,879.95. It then assumed one missed meal period and one missed rest period per week, times 5,097 workweeks, times .25, equals $71,086.27.[22]

These potential damages are $5,421,982.71 at the low end and $6,738,455.20 with the higher calculations.[23] The plaintiff seeks attorney's fees.[24] Assuming either twenty percent or twenty-five percent for attorney's fees, TriStruX calculates the total amount in controversy as four possible numbers, all more than $5 million: $6,506,379.25 ($5,421,982.71 plus twenty-percent attorney's fees of $1,084,396.54), $6,777,478.39 ($5,421,982.71 plus twenty-five-percent fees of $1,355,495.68), $8,086,146.24 ($6,738,455.20 plus twenty-percent fees of $1,347,691.04), or $8,423,069.00 ($6,738,455.20 plus twenty-five-percent fees of $1,684,613.80).[25]

On September 8, 2023, the plaintiff e-signed an arbitration agreement with TriStruX that required arbitration of disputes with TriStruX and any of its employees, including all disputes relating to the California Labor Code, IWC Work orders, state and local law, and public policy. It provides that arbitration is conducted under the Employment Rules of the American Arbitration Association, requires a neutral arbitrator, provides for a selection process if the parties cannot agree on an arbitrator, allows discovery of essential documents and witnesses, allows the arbitrator to amend discovery procedures, provides that TriStruX pays the arbitration fees, has a process for a tentative written decision within fifteen calendar days of the arbitration and for written comments within fifteen calendar days of the tentative decision, requires the transmission of the final award in writing fifteen calendar days later, and provides that the arbitration agreement survives the employment relationship.[26]

All parties consented to magistrate jurisdiction under 28 U.S.C. § 636(c)(1).[27] The court held a hearing on June 27, 2024.

---

[22] *Id.* at 13 (¶ 71) (citing Potter Decl. – ECF No. 1-2 at 7 (¶ 32)).

[23] *Id.* at 14–15 (¶ 76).

[24] Compl. – ECF No. 1-1 at 28.

[25] Notice of Removal – ECF No. 1 at 14–15 (¶ 76).

[26] Arbitration Agreement – ECF No. 8-1 at 9–13 (§§ 1, 6–9); Opp'n – ECF No. 13 at 11 (acknowledging that the plaintiff e-signed the agreement).

[27] Consents – ECF Nos. 10, 12.

# ANALYSIS

## 1. Motion to Remand

The first issue is whether the court has subject-matter jurisdiction under CAFA such that the motion to remand should be denied. The plaintiff does not dispute that minimal diversity exists but does dispute whether the $5 million amount-in-controversy requirement is met.[28] It is met.

### 1.1 Legal Standard

28 U.S.C. § 1441(a) provides that a defendant may remove a case to federal court if the plaintiff could have filed the case initially in federal court based on federal-question or diversity jurisdiction. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). District courts are courts of limited jurisdiction and, therefore, generally construe the removal statute strictly and reject federal jurisdiction if there is any doubt as to the right of removal. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). On removal, the removing party has the burden of establishing the court's jurisdiction. *Ethridge v. Harbor House Rest.*, 861 F.2d 1389, 1393 (9th Cir. 1988). Some of the strict presumptions against federal jurisdiction are, however, relaxed when CAFA is the basis for jurisdiction.

When a case is removed under CAFA, it is incorrect for the court to view removal with "skepticism and resistance." *Jauregui v. Roadrunner Transp. Servs., Inc.*, 28 F.4th 989, 993 (9th Cir. 2022). Under CAFA, federal district courts have original jurisdiction over class actions where (1) the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, (2) the class contains 100 or more putative class members, and (3) there is at least minimal diversity between the parties. 28 U.S.C. § 1332(d). The $5-million jurisdictional minimum may be based on aggregation of the claims of all potential class members. *Id.* § 1332(d)(6).

A defendant's notice of removal under CAFA need include only "a plausible allegation that the amount in controversy exceeds the jurisdictional threshold," and not evidentiary submissions. *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015) (quoting *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014)). Evidentiary submissions are not required

---

[28] Opp'n – ECF No. 13 at 9–10; Mot. to Remand – ECF No. 17 at 3–10.

unless the plaintiff contests, or the court questions, the defendant's allegations. *Dart Cherokee*, 574 U.S. at 89. If the plaintiff contests the amount in controversy, and the complaint does not include a facially apparent amount in controversy, "both sides submit proof," and "the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." *Chin v. Cole Haan, LLC*, No. 16-cv-02154-JD, 2016 WL 7211841, at *1 (N.D. Cal. Dec. 13, 2016) (quoting *LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1202 (9th Cir. 2015)); s*ee Ibarra*, 775 F.3d at 1199.

When removal is based on CAFA jurisdiction, there is "no antiremoval presumption." *Dart Cherokee*, 574 U.S. at 89. But the removing party bears the burden of proving that jurisdiction is proper and "persuad[ing] the court that the estimate of damages in controversy is a reasonable one." *Chin*, 2016 WL 7211841, at *1 (quoting *Ibarra*, 775 F.3d at 1197). In this respect, a defendant removing under CAFA may satisfy its burden of establishing jurisdiction by relying "on a chain of reasoning that includes assumptions to satisfy its burden to prove by a preponderance of the evidence that the amount in controversy exceeds $5 million,' as long as the reasoning and underlying assumptions are reasonable." *Jauregui*, 28 F.4th at 993 (cleaned up). Furthermore, if a defendant relies on assumptions that the court disagrees with, "the district court should consider the claim under [a] better assumption—not just zero-out the claim." *Id*. at 996.

In addition to the defendant's reasoning and assumptions, CAFA's requirements are tested by "real evidence" under procedures entrusted to the district court's discretion. *Ibarra*, 775 F.3d at 1198–1200. "The parties may submit evidence outside the complaint, including affidavits or declarations, or other summary-judgment-type evidence relevant to the amount in controversy at the time of removal." *Id*. at 1197 (cleaned up). For example, "a declaration submitted by a company employee attesting to a review of business records can constitute competent evidence supporting amount-in-controversy calculations." *Ramirez v. HV Glob. Mgmt. Corp.*, No. 21-cv-09955-BLF, 2022 WL 1210402, at *3 (N.D. Cal. Apr. 25, 2022) (citing *Jauregui*, 28 F.4th at 992). The procedural minimum is that both parties should have "a fair opportunity to submit proof." *Ibarra*, 775 F.3d at 1200.

1     The amount in controversy means the "amount at stake and does not mean likely or probable

2  liability; rather, it refers to possible liability." *Jauregui*, 28 F.4th at 994 (cleaned up).

3     **1.2  Application**

4     The plaintiff contends that TriStruX's calculations (set forth in Ms. Potter's declarations) are

5  speculative and lack foundation.[29] The sworn declarations are admissible or, at least, the

6  information could be presented in admissible form at trial. Ms. Potter identifies her position, is

7  familiar with the defendants' records for their workforce in California, and reviewed the records and

8  used them as a basis for her calculations. This is sufficient as "summary-judgment-type" evidence.

9  *Sloan v. Pfizer, Inc.*, No. C 08-1849 SBA, 2008 WL 4167083, at *2 (N.D. Cal. Sept. 8, 2008)

10 ("Personal knowledge may be inferred from a declarant's position."); Fed. R. Civ. P. 56(c)(4) ("An

11 affidavit or declaration used to support or oppose a motion must be made on personal knowledge,

12 set out facts that would be admissible in evidence, and show that the affiant or declarant is

13 competent to testify on the matters stated."); *JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d

14 1098, 1110 (9th Cir. 2016) (the court can consider evidence at summary judgment if the underlying

15 evidence "could be provided in an admissible form at trial, such as by live testimony").

16    The underlying data thus are appropriate predicates for the calculations. The issue then is whether

17 the assumptions are reasonable and if so, whether — by calculations predicated on those reasonable

18 assumptions about the data — the defendants establish by a preponderance of the evidence that the

19 amount in controversy is at least $5 million. *Jauregui*, 28 F.4th at 993. The court may adjust the

20 assumptions rather than "zero-out the claim[s]," at least where it is clear that the claim is worth more

21 than nothing and the defendant has otherwise provided adequate data. *Id.* at 996.

22    The plaintiff contends that by using the words "at times" or "on occasion," there is no basis for

23 the defendants' assumption of a one-hundred-percent violation rate and the corresponding one

24 hour of unpaid minimum wages per week.[30] Similarly, there is no basis for assuming one or two

25 hours a week for overtime pay. The employees worked on average 7.62 hours a day (or 38.2 hours

---

[29] Pl.'s Evid. Objs. – ECF No. 17-1.

[30] Mot. to Remand – ECF No. 17 at 11–12.

per week), but the defendants did not say how many days per week they worked or how many hours per week, which is necessary data for determining the entitlement to overtime. Even assuming 7.62 hours per day/38.2 hours per week is enough, employees would need to work an extra 3.8 hours a week (and there is no data to support this) for the defendants' math to work.[31] The plaintiff levels similar criticism at the defendants' assumption of one or two meal-and-rest premiums, which allows the defendants to assume a one-hundred-percent violation rate for wage statements. The defendants do not say whether the figure includes premiums already paid to employees, which is available data that potentially would offset the damages.[32]

The defendants respond that their calculations are reasonable — despite the plaintiff's caveating of his claims by using limiting language such as "on occasion" and "at times" — because the plaintiff alleged the following: (1) the Labor Code violations were "typical" across putative class members and were caused by "Defendants' common course of conduct;" (2) "[t]he claims of Plaintiff herein are typical . . . of the relief which would be sought by each Class Member in separate actions;" (3) "Class Members, as further described [herein], have been damaged and are entitled to recovery by reason of Defendants' policies and/or practices that have resulted in the violation of the Labor Code at times, as set out herein;" (4) "Defendants employed policies and practices that resulted in, at times, not paying Plaintiff and Class Members in accordance with Labor Code section 204; and (5) all of the acts were "authorized" and "directed" by the "officers and management-level employees" of the defendants (meaning, the plaintiff alleges a policy and practice)."[33] The plaintiff also alleges facts on a systematic and classwide basis: the plaintiff and class members were required to "come early to work and leave work late without being able to clock in for all that time . . . to complete pre-shift tasks before clocking in and post-shift tasks after

---

[31] *Id.* at 12–13.

[32] *Id.* at 13; *see id.* at 13–15 (arguing also that the court should not replace an unreasonable one-hundred-percent violation rate with its own rate, citing cases disproving the assumption of eight-hour days in calculating waiting-time penalties, and generally arguing that the defendants have no data to support their assumptions).

[33] Opp'n to Mot. to Remand – ECF No. 20 at 20 (citing Compl. – ECF No. 1-1 at 17 (¶ 31), 18 (¶ 33), 25 (¶ 84), 10–11 (¶ 8)) (complaint citations in the order of the five points).

ORDER – No. 24-cv-01319-LB                 10

clocking out, to clock out for meal periods and continue working, to clock out for rest periods, . . . to attend company meetings off the clock, and/or go through security screening and temperature checks off the clock; [and were subject to] detrimental rounding of employee time entries, editing and/or manipulation of time entries; to the detriment of Plaintiff and Class Members."[34] These allegations were alleged on a classwide basis as being "typical" of class members and caused "injuries and damages arising out of and caused by Defendants' common course of conduct."[35]

The defendants also take issue with the plaintiff's characterization of a one-hundred-percent error rate for the overtime, minimum-wage, and meal-and-rest period claims: a one-hundred-percent violation rate assumes that violations happen every shift, which the defendants agree "would be unsupported." Instead, the defendants assume a violation once or twice a week (meaning one or two out of every five shifts), which is either a twenty-percent or forty-percent violation rate.[36] And because waiting-time, wage-statement, and similar statutory penalties are derivative of the claims, a one-hundred-percent violation rate is appropriate because only one violation needs to occur in each pay period or workweek to trigger the penalties.[37] They point out that overtime depends on hours worked in a day, not a week, and — based on their conservative 7.62-hour workday (excluding overtime hours recorded and any paid or unpaid leave) — meant that there were shifts that were longer, and shifts that were shorter, resulting in possibly one or two violations for every shift.[38] *Jauregui*, 28 F.4th at 994 (the "[a]mount at stake does not refer to likely or probable liability and instead refers to *possible* liability").

The defendants also "use the lowest minimum wage mandated during the applicable period and use a narrower time period and class size" than the plaintiff pleads: they use $13 per hour and a three-year statute of limitations.[39]

---

[34] *Id.* at 20–21 (citing Compl. – ECF No. 1-1 at 13 (¶ 15)).

[35] *Id.* at 21 (citing Compl. – ECF No. 1-1 at 17 (¶ 31)).

[36] *Id.* at 21–22.

[37] *Id.* at 22 (citing *Nunes v. Home Depot U.S.A., Inc.*, No. 19-cv-01207, 2019 WL 4316903, at *3 (E.D. Cal. Sept. 12, 2019)).

[38] *Id.* at 23–24.

[39] *Id.* at 25 (citing Notice of Removal – ECF No. 1 at 6–9).

ORDER – No. 24-cv-01319-LB                            11

1    The assumptions are reasonable.

2    First, for the overtime and minimum-wage claims, TriStruX's more conservative rate is twenty
3    percent (one in five shifts). District courts have found rates from twenty to sixty percent
4    reasonable. *Ramirez*, 2022 WL 1210402, at *4 (collecting cases). The limiting language — read in
5    the context of the other allegations in the complaint — does not alter this conclusion: as the
6    defendants point out, based on the law of averages, there will be shifts that exceed the average
7    7.62 hours and shifts that do not. It is reasonable to assume one violation. Other courts have
8    reached this conclusion. *Cabrera v. S. Valley Almond Co.*, No. 121CV00748AWIJLT, 2021 WL
9    5937585, at *8 (C.D. Cal. Dec. 16, 2021) (finding assumption of one hour of unpaid overtime and
10   one hour of unpaid minimum wages (per week) consistent with limiting language of "at times"
11   and "on occasion").[40] Also, the defendants used a three-year statute of limitations, a smaller class
12   size than that in the complaint, and the lowest minimum wage in the applicable period. The
13   defendants' calculation is reasonable.

14   Second, the § 1197.1 penalties are based on reasonable assumptions. Based on a twenty-
15   percent violation rate, and § 1197.1's one-year statute of limitations, there is one violation per
16   every five shifts, and the defendants applied the statutory penalty scheme ($100 for the initial
17   violation and $250 for every subsequent violation) for the actual pay periods worked to calculate
18   the damages.

19   Third, the twenty-percent violation rate for meal-and-rest breaks is reasonable. *Ramirez*, 2022
20   WL 1210402, at *5 (twenty-five percent reasonable in case involving allegations of "pattern or
21   practice" of meal-and-rest-breaks violations); *Cabrera*, 2021 WL 5937585, at *6 (twenty percent
22   where complaint alleged only "at times").[41]

23   Fourth, the assumptions regarding waiting-time penalties are reasonable. The defendants
24   provided necessary details (missing in other cases cited by the plaintiff): an average shift length of
25   7.62 hours, an identification of 275 of 276 putative class members classified as fulltime employees

---

[40] *See id.* at 24 (collecting other cases).

[41] *See id.* at 26 (collecting cases).

who normally were scheduled for five eight-hour shifts per week, and calculations that account for all leaves of absence based on family and medical leave and workers' compensation and the duration of the leave period.[42]

Fifth, the calculations for the wage-statement penalties are based on reasonable assumptions. The penalties apply for a single violation. As discussed above, it is reasonable to assume one overtime, minimum-wage, meal-break, or rest-break violation each week. Thus, "[i]t follows that each of the bi-weekly wage statements . . . contained an error of some sort". *Cabrera*, 2021 WL 5937585, at *10. TriStruX pays employees weekly. During the one-week period between January 26, 2023, and January 26, 2024, there were 5,097 workweeks, 143 qualifying employees, and a resulting total of $425,550 (based on a value of $50 for the first statement and $100 to each subsequent statement).

Sixth, the attorney's fees calculations are based on reasonable assumptions. *Ramirez*, 2022 WL 1210402, at * 8 (the twenty-five-percent benchmark is reasonable) (collecting cases).

In sum, the most conservative estimate results in an amount in controversy of more than $6 million. The higher $8,423,069 also is based on reasonable assumptions. The amount-in-controversy requirement is met. The court has jurisdiction under CAFA.

Finally, the plaintiff contends that the case should be remanded because the court lacks equitable jurisdiction over the plaintiff's UCL claim.[43] TriStruX responds that the plaintiff did not timely move to remand within thirty days of removal.[44] "[T]he lack of equitable jurisdiction often results in the equitable claim being dismissed without prejudice" to its being refiled in state court. *Granato v. Apple Inc.*, No. 5:22-cv-02316-EJD, 2023 WL 4646038, at *6 (N.D. Cal. July 19, 2023) (collecting cases); *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1313–15 (9th Cir. 2022). The court thus dismisses the UCL claim without prejudice to its being refiled in state court.

---

[42] *Id.* at 28 (citing Potter Decl. – ECF No. 1-2 at 4 (¶ 11.d); Potter Supp. Decl. – ECF No. 20-1 at 4 (¶ 13)).
[43] Mot. to Remand – ECF No. 17 at 16–17.
[44] Opp'n to Mot. to Remand – ECF No. 20 at 32–33.

### 2. Motion to Compel Arbitration

The second issue is whether the parties' arbitration agreement is valid or instead is unenforceable because it is unconscionable. The court enforces the arbitration agreement.

#### 2.1 Legal Standard

Under the Federal Arbitration Act (FAA), "arbitration is a matter of contract, and courts must enforce arbitration contracts according to their terms." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67 (2019).

The FAA provides that arbitration agreements are unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening" federal law. *Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). "Under California law, 'the party opposing arbitration bears the burden of proving any defense, such as unconscionability.'" *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1260 (9th Cir. 2017) (quoting *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 236 (2012)). The court may consider material outside of the pleadings. *Thompson v. Isagenix Int'l LLC*, 849 F. App'x 712, 712 (9th Cir. 2021); *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 & n.1 (9th Cir. 2021) (collecting cases for the proposition that "[t]he summary judgment standard is appropriate" under 9 U.S.C. § 4).

In California, contractual unconscionability has procedural and substantive components. *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000). "[T]he former focus[es] on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results." *Id.* (cleaned up). To establish the unconscionability defense, "the party opposing arbitration must demonstrate that the contract as a whole or a specific clause in the contract is both procedurally and substantively unconscionable." *Poublon*, 846 F.3d at 1260 (citing *Sanchez v. Valencia Holding Co.*, 61 Cal. 4th 899, 910 (2015)). "Procedural and substantive unconscionability 'need not be present in the same degree.'" *Id.* (quoting *Sanchez*, 61 Cal. 4th at 910). "Rather, there is a sliding scale: 'the more substantively oppressive the contract

1  term, the less evidence of procedural unconscionability is required to come to the conclusion that
2  the term is unenforceable, and vice versa.'" *Id.* (quoting *Sanchez*, 61 Cal. 4th at 910).

3  Procedural unconscionability focuses on the circumstances surrounding the negotiation of the
4  contract. *Gatton v. T–Mobile USA, Inc.*, 152 Cal. App. 4th 571, 581 (2007). Specifically,
5  procedural unconscionability can arise from oppression or surprise. *Armendariz*, 24 Cal. 4th at
6  114. "Oppression arises from an inequality of bargaining power which results in no real
7  negotiation and an absence of meaningful choice." *Bruni v. Didion*, 160 Cal. App. 4th 1272, 1288
8  (2008) (cleaned up). "Surprise involves the extent to which the supposedly agreed-upon terms of
9  the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed
10 terms." *Id.* (cleaned up); *Correa v. Firestone Complete Auto Care*, No. C 13–03123 CW, 2013
11 WL 6173651, at *2 (N.D. Cal. Nov. 25, 2013).

12 No matter how great the procedural unconscionability, a contract is enforceable under California
13 law unless it is also substantively unconscionable. *Correa*, 2013 WL 6173651, at *3 (citing
14 *Armendariz*, 24 Cal. 4th at 114). Substantive unconscionability focuses on the harshness and one-
15 sidedness of a contract's substantive terms. *Id.* (citing *A & M Produce Co. v. FMC Corp.*, 135 Cal.
16 App. 3d 473, 486–87 (1982)).

### 2.2 Application

The plaintiff contends that the arbitration agreement is unenforceable because (1) TriStruX did not sign it, (2) the agreement is substantively unconscionable, and (3) it is procedurally unconscionable.[45]

### 2.2.1 Signing

Courts have enforced arbitration agreements signed only by the employee. And here, the issue is an employee's acceptance of his employer's unequivocal employment contract about dispute resolution. The employee's acceptance is express. The employer's acts — its offered agreement and the requirement for acceptance during the onboarding process as a condition of employment — are unequivocal. *See, e.g.*, *Trujillo v. Motts LLP*, No. CV 22-5103 JGB (KKX), 2023 WL 6194054, at

---

[45] Opp'n – ECF No. 13 at 11–21.

*4 (C.D. Cal. Jan. 4, 2023) (enforcing arbitration agreement not signed by the employer) (citing *Serafin v. Balco Props. Ltd., LLC*, 235 Cal. App. 4th 165, 176–177 (2015)); *see also Hermosillo v. Davey Tree Surgery Co.*, No. 18-CV-00393-LHK, 2018 WL 3417505, at *7 (N.D. Cal. July 13, 2018) ("Mutual assent may be manifested by written or spoken words, or by conduct.").[46]

### 2.2.2   Substantive Unconscionability

The issues are whether the agreement is substantively unconscionable because it has a choice-of-law provision for New Jersey law (not California), shifts attorney's fees, contains a confidentiality agreement, requires the plaintiff to pay more for arbitration than for a court action, limits discovery, and unlawfully limits the plaintiff's right to bring a PAGA action.

First, the defendants do not assert that New Jersey law applies and agree that California substantive law applies.[47] California law applies.

Second, the prevailing-party fees provision is not mandatory: the arbitrator has discretion to award relief (such as fees) that would be available in a non-arbitration forum. The defendants concede that the only remedies are those that the law permits.[48] Thus, there is no fees provision. In a similar case, the court reached this result. *Khraibut v. Chahal*, No. 15-cv-04463-CRB, 2016 WL 1070662, at *1, *9 (N.D. Cal. Mar. 18, 2016) (upholding similar discretionary fee-shifting provision and distinguishing it from unconscionable mandatory fee-shifting provisions). The court in any event can sever the fees provision. The defendants suggested that approach at oral argument. To avoid any issues, the court severs the provision.

Third, the employee's initial arbitration fee is $300. Otherwise, the defendant pays all fees. The defendants concede that the plaintiff's maximum fee exposure is $300.[49] This is not unconscionable because it does not require the plaintiff "to pay costs that are not equivalent in

---

[46] Reply – ECF No. 14 at 6 (collecting cases on this point).

[47] *Id.* at 8 (citing Cal. Lab. Code § 925 (prohibiting employers from requiring employees to waive substantive rights available under California law).

[48] *Id.* at 9.

[49] *Id.* at 10–11.

type and amount than what would be required in a court action." *Kessler v. Oakwood Worldwide (US) LP*, No. 20-CV-06524-KAW, 2021 WL 5414323, at *5 (N.D. Cal. Mar. 10, 2021).

Fourth, the plaintiff contends that the arbitration agreement's confidentiality provision prevents him from discussing his wages.[50] This is the confidentiality provision at issue:

> The Parties agree that, except to the extent that disclosure may be required pursuant to subpoena, deposition notice, discovery requests, court order or process, or otherwise required by law or ordered by the arbitrator, the conduct of, and decision, results, and any award of the arbitration are and shall be confidential and shall be kept confidential and secret by the Parties to this Agreement, and their respective attorneys, agents, and employees, except that the Parties may disclose the contents of this Agreement to their respective attorneys, auditors, accountants, insurers, clergy, and immediate family. The Parties further agree that any comment by the Parties, and their attorneys, agents, and employees regarding the result of any arbitration shall be limited to a statement that the Parties settled their differences and resolved all controversies between them.[51]

The defendants concede that this does not limit a party's right to disclose information about wage information and excludes any information where disclosure is required by law or as ordered by the arbitrator.[52] Courts have upheld similar provisions as not unconscionable. *Poublon*, 846 F.3d at 1265–67; *Sanchez v. CarMax Auto Superstores Cal. LLC*, 224 Cal. App. 4th 398, 408 (2014).

Fifth, the discovery restrictions are not unconscionable. Discovery is allowed, and the arbitrator can allow discovery beyond those limits. The agreement has procedures for document requests, two depositions (unless the arbitrator allows more), and discretion to amend discovery procedures. Courts have upheld similar procedures. *Torrecillas v. Fitness Int'l, LLC*, 52 Cal. App. 5th 485, 497–98 (2020) (evaluating discovery limits); *Dotson v. Amgen*, 181 Cal. App. 975, 982–84 (2010) (arbitrator had discretion to grant additional discovery).

Sixth, the plaintiff contends that the arbitration agreement does not have a carve-out for representative claims brought under PAGA. Under the Supreme Court's reading of state law, at least, the plaintiff would now "lack[] statutory standing to . . . maintain . . . non-individual [PAGA] claims," because any individual PAGA claim she asserts must be arbitrated. *Viking River Cruises,*

---

[50] Opp'n – ECF No. 14 at 16.

[51] Arbitration Agreement – ECF No. 13-2 at 5 (§ 10).

[52] Reply – ECF No. 14 at 11.

*Inc. v. Moriana*, 596 U.S. 596, 663 (2022). But the California Supreme Court, as the final arbiter on state law, has now held otherwise. *Adolph v. Uber Techs., Inc.*, 14 Cal. 5th 1104, 1119–24 (2023). "[A]n order compelling arbitration of individual claims does not strip the plaintiff of standing to litigate non-individual claims in court. This is the interpretation of PAGA that best effectuates the statute's purpose, which is to ensure effective code enforcement." *Id.* at 1123 (cleaned up). The court thus stays non-individual PAGA claims pending the outcome of the arbitration. *Id.* at 1123; *Diaz v. Macys W. Stores, Inc.*, No. 22-56209, 104 F.4th 697, 706 (9th Cir. 2024). Also, if the arbitrator determines that the plaintiff is an aggrieved employee in the process of adjudicating her individual PAGA claim, "that determination, if confirmed and reduced to a final judgment . . . would be binding on the court, and [the plaintiff] would continue to have standing to litigate h[er] nonindividual claims." *Adolph*, 14 Cal. 5th at 1123–24. Conversely, "[i]f the arbitrator determines that the plaintiff is not an aggrieved employee and the court confirms that determination and reduces it to a final judgment, the court would give effect to that finding, and [the plaintiff] could no longer prosecute h[er] non-individual claims due to lack of standing." *Id.* at 1124.

### 2.3   Procedural Unconscionability

The plaintiff contends that the arbitration agreement is a contract of adhesion and does not identify the rules that govern arbitration.[53] First, the agreement allowed the plaintiff to revoke it within seven calendar days after signing it.[54] *Mohamed v. Uber Techns., Inc.*, 843 F.3d 1201, 1211 (9th Cir. 2016) (arbitration agreement not adhesive if "there is an opportunity to opt out of it"). Second, the incorporation by reference of the AAA employment rules does not establish procedural unconscionability. *Campos v. JP Morgan Chase Bank N.A.*, No. 18-cv-06169-JSC, 2019 WL 827634, at *6–7 (N.D. Cal. Feb. 21, 2019).

\*   \*   \*

---

[53] Opp'n – ECF No. 13 at 19–20.

[54] Arbitration Agreement – ECF No. 8-1 at (§ 12).

The court compels arbitration of all claims except the UCL claim, which is dismissed without prejudice to refiling it in state court. This decision is without prejudice to the plaintiff's asserting a representative PAGA claim. The court stays the case pending arbitration.

## CONCLUSION

The court denies the motion to remand, grants the motion to compel arbitration without prejudice to the plaintiff's asserting a representative PAGA claim, dismisses the UCL claim without prejudice to its being refiled in state court, and stays the case.

**IT IS SO ORDERED.**

Dated: June 27, 2024

_____
LAUREL BEELER
United States Magistrate Judge